Components Inc. Oral argument is not to exceed 15 minutes per side. Clay Taylor for the appellant may proceed. Thank you. I'd like to reserve three minutes. Great. Thank you. May it please this court. My name is Clay Taylor. I'm from Edina, Minnesota. I represent the appellant Midwest Engineered Components or MEC. The lower court erred in its consideration of the interplay between the restatement of conflicts and the anti-waiver provision of the Minnesota Sales Rep Act, which we call the MSRA. The lower court erred when it applied common law choice of law rules and held that Kentucky, Kentucky law term of the party's contract, governed the claims in this case. Notwithstanding, it did this notwithstanding the clear mandate of the MSRA that such contract terms are void. Choice of law terms in contracts are void to the extent that they apply to Minnesota Commissioned Sales Reps working in Minnesota, like MEC. By applying common law choice of law rules and disregarding the anti-waiver provision of the act, the lower court erred as a matter of law and should be reversed. This is the linchpin issue in this case. Why do I say it's a linchpin issue? First of all, reversal of the district court on this issue alone will undo all prior rulings, verdicts, and judgments in this case. And under the circumstances, we believe that is fair and it's proper. But more importantly, perhaps, and the principal reason why we're here is that this court's consideration and ruling on this issue will resolve a split between at least a half dozen, a half dozen district courts around the United States who've looked at this very same question and come to different conclusions. And for practitioners like myself, I've represented independent sales agents in Minnesota for almost 40 years, and a resolution of this issue will be enormously helpful to us as well. From a practical standpoint, if you think about it practically, the lower court here effectively allowed Don Figlioli to reach into the state of Minnesota, hire a Minnesota Commissioned Sales Rep Agency, and effectively outsource all its sales and marketing functions in the entire upper Midwest to that Minnesota entity. That Minnesota entity would go on to sell millions and millions of dollars of its products, and Barn Figlioli would enjoy those millions of dollars of revenue without the corresponding obligation, without the corresponding obligation to abide by the MSRA. So then is your argument then focused on that really primarily all the activity at issue in this contract between the parties was Minnesota-based, and therefore Minnesota law applies? Is that kind of the overarching test that you're trying to get us to apply with that argument? It's kind of a three-phase approach. First of all, I think the analysis under the restatement is inappropriate, considering the fact that under subdivision 6 of the MSRA, MEC is clearly covered by the statute. So you think that we don't look to Kentucky law at all, even choice of law? That's certainly, Judge Blomkast, that's certainly Judge Thunheim's view on it in the heading case, which has been quoted and featured prominently in our brief. That's exactly what Judge Thunheim said, that it would be inappropriate to step out onto the slippery slope of looking at sections 187 and 188 of the restatement to determine which jurisdiction has the center of gravity when we're dealing with a Minnesota rep who's covered by the statute because they're a Minnesota citizen and their territory includes the state. Well, what about all of the other territories where much more of the actual money was made? Right. Much more of the product was sold, much more of the commissions were earned. Wasn't Minnesota the least earning state among the list? Judge Strange, you're correct that there were several other states, one of them being Illinois, which is a much larger market. But the idea here is the choice presented to the district court was between Minnesota and Kentucky. On the list of all the areas where contract performance took place as required by paragraph three of the contract, which outlines the functions that my client is supposed to perform in the territory. But the idea is Kentucky's not even on the list. Combine that, Judge, I think, with the lower court's agreement with us that Minnesota was the center of gravity for the actual performance of the contract in its analysis under section 188 of the restatement, the most substantial relationship test. They said Minnesota is the place of performance and Bonfiglioli is hard-pressed and cannot demonstrate that Kentucky is the center of gravity. That was one of the factors, right? Right. And the court went on to describe other factors. One of the other factors that they... I guess what I'm struggling with is that Minnesota is involved because of the position your client took as opposed to involved or chosen for the place where most of the products were sold. I understand it that the individual who signed the contract works out of Wisconsin. Is that correct? No, that's incorrect. That's incorrect, okay. That's incorrect. Then what office is in Wisconsin? His home office in Wisconsin, and he did not sign the contract. I'm here today with my client, Patrick Frater. He purchased the company, and the contract was already in place. He did not sign it. No, I understand that. Oh, okay. And that was part of the issue, that the original MEC then changed character, supposedly. I think it was administratively dissolved, and your client purchased that entity. What happened was Mr. Lastovich, who signed the contract, a Minnesota resident. MEC is a Minnesota citizen. It's incorporated in Minnesota. It has an office, an administrative office, where all this gets coordinated in Burnsville, Minnesota. I'm sorry. Your argument seems to hinge a lot on the anti-waiver provision in the statute. Does that mean any time a state has an anti-waiver provision that that law is just going to take precedence? How do we then deal with if we have ... Take out of this context for a second, but what if we had Kentucky say, well, any contract made in Kentucky, you can terminate the contract at any time, and this provision, nobody can waive, nobody can pick a different venue, nobody can pick a different choice of law on a contract. Sure. Okay, so who do we choose then? I can go on, quite frankly, on and on with this hypothetical. You have at least, what, like five states here involved.  So don't we then take the predicate step of doing a choice of law analysis as opposed to just looking at an anti-waiver provision? I would agree with you to the extent if there is only a tangential relationship between the contract and the performance of that contract and the subject of that contract in the state of Minnesota. For instance, if the Chicago- You could have more than a tangential relationship with multiple states, and you're not getting out of the problem of my hypothetical. So the test, therefore, can be where is there a tangential relationship, which I think goes back then to the question of where is all the action going on here. Do we really say that all the action in this contract emanates out of Minnesota, or do we say it emanates out of Kentucky? And quite frankly, we use Kentucky law that sets forth that test with the factors in it or their incorporation of the restatement. But it also ignores, Your Honor, the reality that Kentucky itself has several statutes that have anti-waiver provisions and void choice of law provisions. It leads to a selective application, if you will. And what we outlined in our brief is that there are 37 states that have sales rep regulation of the relationship. And most of those have almost identical anti-waiver provisions to the MSRA. Besides Minnesota, are those others in your sales district? Some of them were. Some of them were. I believe Wisconsin. And I believe Illinois. Don't quote me on that. But I believe Illinois. But I've had clients, Your Honor, who are at the Chicago Merchandise Mart selling apparel. And they come and they incorporate their businesses in Minnesota to take advantage of the MSRA. There are hundreds of these reps in Chicago that do this. Would the anti-waiver provision protect their ability to bring claims under the MSRA? That's kind of beyond the scope of the facts of this case. But at the same time, I can see a legitimate concern about that. Absolutely. I'm not going to concede that the MSRA anti-waiver provision is somehow bulletproof. But that's certainly bonfiglioli in the district court's opinion as to the choice of law provision in their contract. And it's not bulletproof. I'd like to quickly move on. Does it not turn more on Kentucky's somewhat unusual standard of Section 187, Section 188?  They have long had a very, I think you refer to it as egocentric, that Kentucky guards its own law. Right. So help me understand why that might not play a role, it is an unusual state position, but might not play a role in this case where all of the product is manufactured in Kentucky, all of the product is shipped from Kentucky, all of the billing is made through Kentucky, which are other things that the court analyzed as making a difference here. Sure. But if I might very quickly say the overarching policy that the district court was concerned about was the sanctity of the parties to contract. It wasn't where the location of performance was. The court held that it was Minnesota with the strongest connection. It wasn't the subject matter of the contract, which the district court improperly said the subject matter of the contract was Bonfiglioli's products, which gets to your point exactly. But that's not the subject matter of the contract. If you look at Paragraph 3 of the contract, it provides a 15 or 20-item grocery list of sales, distribution, and marketing functions that are to be performed by my client, which is the subject matter of the agreement. And that's unavoidable. So if you look at it from the standpoint that the district court held that the most substantial relationship favored Minnesota over Kentucky, if you look at the fact that the actual subject of the contract was not Bonfiglioli's products but sales services, even if you apply Section 188, even if you do, it was done wrong and should be reversed. Thank you. Thank you. You'll have your rebuttal. May it please the court. My name is Justin Knapik, and I represent the appellee, Bonfiglioli USA, Inc. Each of Judge Reeve's challenge rulings in this case should be affirmed. A jury unanimously found that MEC fraudulently induced my client into a contract it never intended to perform. MEC should not be heard to challenge and complain that the very same terms of that contract should not be applied to it. Moving to the first issue that MEC just concluded was the linchpin of its case, the conflicts of law analysis. Judge Reeve's opinion was correct. It is settled law in the Sixth Circuit that the district court applies the conflicts of law analysis from the state in which it sits. In this case, that is Kentucky. Judge Reeve's ruled that the Kentucky case was the first filed case, and that decision is not challenged by MEC before this court. Being a Kentucky case, the Kentucky conflicts of law analysis controls, and this court has long held that and has long held that position. In Hackney and in Osborne v. Griffin, this court concluded that Kentucky applies the most significant relationship test for Statement Section 188, and Kentucky does so even in the face of an otherwise valid choice of law provision. Can you talk a little bit about in the application of that test, it strikes me that at least some of the factors are subject to various characterizations. If you think about the contract, you can say, well this is about sales of the product. Do we focus on the product? Do we focus on the sales, where it's ultimately sold to, where the telephone calls happen? We live in a very interconnected world. Actions are not just happening, quite frankly, within any country, certainly not any state. How do we apply that to a test like that when we're trying to figure out where most of the things are happening? Certainly. There are actions on both sides of the equation in many different states, as this court pointed out earlier. There are seven different states at play here, Kentucky, Minnesota, Iowa, North Dakota, South Dakota, Wisconsin, and Illinois. Each one of those states is at play. There are many factors from which this court needs to draw its analysis, and no factor is controlling. I believe the sales representative agreement is the easiest place to start. But Mr. Taylor misinterprets that agreement. Mr. Taylor argues that it was solely based on his client's sales. But his client was paid, indisputably, for sales they never made. They were paid for sales within their territory. So the conduct is more than just the sales relationship that MEC was involved in. Certainly MEC would have argued it had a breach of contract claim if Bonfiglioli didn't pay for one of the sales within its territory. So the scope of the contract defines the relationship. So the subject matter is not as simple as saying cherry-picking MEC sales. Again, it was paid for more than the sales it made, and it is undisputed in the record that 80 percent, more than 80 percent, came from states that were other than Minnesota, Wisconsin, and Illinois, as Mr. Taylor pointed out, also have sales representative acts. So defining the scope, it would be my position before this court that that scope is set by the sales representative agreement and the party's conduct. But getting back to Mr. Taylor's overriding point that this court can somehow skip a choice of law analysis because Minnesota says it can, has never, not once, been a position taken by a district court in these United States. The heading case they cite applied Minnesota's choice of law analysis. The same thing has to happen here, and Judge Reeves was correct to apply Kentucky's most significant relationship test to determine what law controls. Kentucky, Minnesota as MEC claims, or potentially it could have been, assuming MEC sought to enforce it, Wisconsin or Illinois. Now the gravity of the- Can you address the interplay, the choice of law methodology of Kentucky? Because generally 188 is, you either have 188 or 187, and they are intertwined but distinct, right? Correct, Your Honor. And so your position just is the law here is that Kentucky has chosen to apply 188, and that settles the matter? As far as the test to be applied to the choice of law, yes, Your Honor. That has already been decided by this circuit in both Hackney and Osborne v. Griffin that Kentucky skips 187, even in the face of the valid choice of law provision, and goes directly to 188. And it is that law that determines the choice of law analysis, and Judge Reeves was correct to find that given the multiplicity of factors, that Kentucky was the state with the most significant relationship. That's where Bonfiglioli was. That's where all of its products are manufactured, stored, or distributed. That's where all the customers paid Bonfiglioli. That's where all of its administrative functions are, order processing, sales servicing, accounting, leadership. Everything that Bonfiglioli did originated from Kentucky. The communications with the parties, Bonfiglioli's signature on the very contract, and most importantly, the parties agreed from day one that Kentucky law would control. And it is not my position that that, again, wins the day. But that factor does check several of the boxes in Section 6 regarding the needs of interstate commerce, the clarity of the party's position, the relevant policies of the forum state, the justified expectation, the ease of determination. Given this in the face of Minnesota's sole interest in this case is that MEC may have incorporated there to take advantage of this statute, and clearly the jury found they took advantage of this statute. But MEC was just incorporated there, and it has its principal office there. But as a traveling salesman, everything it did was spread across its sales territory, which included five states other than Minnesota, and the majority of those sales came from states other than Minnesota. Can we get into the next topic? You talk about MEC was really trying to take advantage of this law and kind of your misrepresentation claim that the jury found. It strikes me that when parties enter contracts, there's, let me explain, kind of like in a doctrine of an efficient breach that we have in contract. They think if some circumstances come to pass, it will make sense for me to breach this contract. Maybe my house is so underwater, it doesn't make sense to pay this mortgage anymore. The price of materials goes up so high, it no longer makes sense for a contractor to build this house anymore. They sign a contract saying, I'm going to build this house, or I'm going to pay this mortgage, knowing if certain conditions come to pass, I'm probably going to walk. Does that give rise to a claim like you had, or how would you distinguish that in your situation, besides for the fact that you kind of have an email memorializing that thought? Yes, the email goes a long way to distinguish this case from many other cases. But Kentucky's case law, which isn't again challenged before this court, is that when a party enters into a contract, its representation of its present state of mind is a representation of fact. And that email clearly established, and the jury clearly found by clear and convincing evidence unanimously, that that email established from day one, MEC intended to use the Minnesota law as a trick and not follow the contract, which provided that Kentucky law was to control. Well, it might not have ever intended to get fired or terminated, right? It may have never come into play at all, right? That might have been true, but the simple fact remains is that their present state of mind, as the jury concluded, as evidenced in that written email, is that at the time they signed the contract, they did not intend to follow through, and that is the misrepresentation. And again, that misrepresentation is not challenged before this court. So all of my hypotheticals, you would also say, could give rise to misrepresentation claims? If the parties entered into those contracts with no intent to follow through, yes, Your Honor, under Kentucky law, that that would be a misrepresentation of fact. Is it an intent to follow through, or just like an intent to be bound by the terms of the contract, right? Like you could have a liquidation, liquidity to damages clause, or something like that, right? You could say, well, I might not make my duties under the terms of this contract, but I'm going to have to pay the consequences, right? You're still following the contract. Does that give rise to a misrepresentation claim? As far as the semantic issue of intent to follow through or intent to be found, that's a fair point to be made, Your Honor. But as far as the settled Kentucky law on the issue, it's the representation of the present state of mind. However we characterize that, that was the misrepresentation that MEC was held liable for. Again, that issue has not been appealed to this court. What MEC appeals to this court is the jury instructions and the justifiable reliance issue. The jury instruction is the second issue. Judge Reeves correctly decided that the fraudulent omission instruction was both irrelevant and likely to confuse the jury. It was irrelevant because my client's fraudulent omission claim had been dismissed prior to the jury trial, and the jury was only instructed on fraudulent inducement. And the jury instructions on that issue were clear. The jury was to look for a misrepresentation effect. And Mr. Frater, when he was on the stand, admitted that MEC represented its intent to be bound when it signed the contract. And that is clearly what the jury found. And again, MEC does not challenge the fraudulent inducement instructions. It does not argue that Judge Reeves' instructions were so loose as to permit the jury to consider silence. It was also likely to confuse the jury because it was going to lead the jury to misunderstand what law applied. Does the Minnesota Sales Representative Act apply? Does Minnesota in general apply? But again, Judge Reeves, before trial, had already decided that Kentucky law applied. It was not an issue for the jury to consider. And this argument also misunderstands Kentucky law. Kentucky follows the bare-bones principle of providing jury instructions. And this court has recognized that fact in the King v. Ford case, a case cited by MEC in its brief. And that principle is that jury instructions should not contain a bunch of detail but should provide only the bare bones of the question for the jury. And more specifically as to MEC's argument, this court acknowledged, whenever counsel feels that jurors might draw inferences that are not warranted by the specific terminology of the instructions, her opportunity to guard against it comes in the closing arguments. MEC was given that opportunity. And most importantly, MEC took the opportunity. The judge allowed them to argue to the jury that they had no duty to disclose? Absolutely, Your Honor. In their closing statement, they argued that they had no duty to disclose and that was not clear and that was not convincing and my client had not proved their case. The jury heard that argument. In fact, MEC was the only party to reference a duty to disclose in the trial. MEC argued it in both its closing statement and MEC argued it in both its opening statement as well. And MEC also questioned jurors. And when Judge Reeves cut MEC's questioning off, MEC agreed that Judge Reeves' instruction to the jurors that the fraudulent omission claim had been dismissed established all the facts that MEC wanted. In short, MEC got in everything it wanted at trial regarding the duty to disclose. There was no issue with the jury instructions. As far as reasonable reliance, as this court has already discussed, the misrepresentation was of the present state of mind. My client sufficiently established its justifiable reliance such that to present the issue to the jury. My clients testified that it was important to them that Kentucky law controlled because that's where their business was. They testified it was so important to them that they put it in the contract so that everyone knew the rules of the game. They knew how they were going to conduct business. And my client also testified that MEC raised no red flags to indicate that it did not intend to be bound. That established... I'm concerned that we're turning kind of a lack of due diligence into a fraud claim. What does it matter to the analysis in your view that this was a question of law that could have been determined ex ante as opposed to some sort of condition factually that plays out like the ones in Jeff Bloomkatz hypothetical about cost changes or things like that? This was a knowable, I guess, thing at the front end. How does that affect the analysis? Well, Your Honor, it is my position that it is not knowable to know MEC's present state of mind at the time of contract. The only party that knew that it was intending to defraud Bonfiglioli was MEC. And Bonfiglioli did the only thing it could at the time. It boiled the party's contract into writing and had MEC sign that it intended to be bound. And MEC, as the email established and the jury found, did not intend to be bound. And so it's the present state of mind that distinguishes it from all of these hypotheticals, and that is the fraud. There was no reasonable due diligence that my client, Bonfiglioli, was going to do to figure out that MEC did not intend to be bound. There was no attorney they were going to hire in Minnesota that was going to discover that, and there was no attorney they were going to hire in the five other states that was going to discover that. The intent is the critical issue, and again, is an issue that MEC does not challenge to this court. And that is what makes my client's reliance justifiable. It did the only thing it could. It asked them what their intent was. They misrepresented it. There was no investigation, no reasonable investigation, my client was going to undertake to determine that. Moving to the final issue, the punitive damages issue, I see that my time is running out. I will just note that MEC's conduct was necessarily found to be reprehensible by the jury, and as far as the ratio factor is concerned, Judge Sipar and the Fast and L.V. Crawford case determined that even though that that consideration might not be applicable for economic reasons and nominal damages cases, the potential harm can be used as part of the ratio factor. Can I ask you a kind of nitpicky question about the timing? I understand that one of the kind of facts that was brought out to prove reprehensibility or to marshal that idea was this letter was 89 days before an auto renew, right? So the auto renew would happen. How does that intersect with your reprehensibility argument or the MSRA? The MSRA, even assuming it applies, allows you to terminate in 90 days with good cause, so you could have just terminated with good cause on the first day of the auto renew. Tell me the significance of those 89 days. Yes, Your Honor, thank you for asking that. To me, that timing is indicative of the entire scheme. You can draw a straight line from the email toward the timing of that letter, and what's important about that letter, it was issued one day after. The first time MEC ever told my client was one day after exactly what you mentioned. My client could have received it, said, I disagree, but I'm going to give them notice of non-renewal, and then the three months passes, and we're out of this situation. We no longer have to argue about it in court. We don't have to spend the money on attorneys. But that is exactly what MEC intended to do was deprive my client of that opportunity. By issuing it one day past the 90-day notice, they guaranteed my client was stuck in this litigation. But if we were to find that the MSRA applies, even had you had 95 days as opposed to 89, wouldn't the same 90-day plus good cause rule apply? Doesn't how the MSRA works also works about renewing? Yes, if the Minnesota statute applies and my client was given 95 days, it could have responded to MEC's notice by giving it notice of non-renewal. And when those 90 days expired, Bonfiglioli would have been out of the situation. It wouldn't need to do good cause. Would not need to do good cause. It would have been out of the auto renewal. But by depriving my client of that opportunity, it did what MEC said in its letter. It said it made business sense to pay $165,000 on a manufactured claim plus attorney's fees because costly litigation was coming, costly and protracted litigation was coming. So the 90 days, sorry to drill down on this, I'm just trying to understand, but the 90 days then is in the MSRA that you have to give before an auto renewal, not just before a termination? Correct, Your Honor. And termination needs good cause, but auto renewal is 90 days, no good cause? Yes, that is my understanding. The MSRA. My client could have been out by just simply responding with, we do not renew our contract. But by sticking my client with the fictitious MTSRA claim, that is what gave MEC the leverage to demand the $165,000 because my client was presented with a choice to go through with costly and protracted litigation or pay $165,000 if it wasn't due. And respectfully, Your Honor, MEC is still proving its point today. We have your argument. Thank you, counsel. May it please the court. I'd like to address the 90 day notice issue first because I really wish we were that sneaky. The notice came only because I was so busy and was not able to jump on this demand letter as quickly as I could, but that's neither here nor there. The reason why Judge Blomkrantz, it is neither here nor there is because there's nothing in the MSRA that requires the sales representative to give any notice, any notice, to a manufacturer. The notice goes the other way. The notice under the statute, if it applies, is that that 90 days advance notice of either non-renewal or a good cause termination needs to be given by the vendor, the manufacturer or importer, and that's bonfiglioli. There's nothing in the act that requires us to give them notice. If we had contended that the- Right, but you agree that after the 89 days, you couldn't have given, the manufacturer couldn't have given you enough notice of non-renewal before the contract itself renewed. The interesting part is we asked for, we treat it as a contract of indefinite duration, which there's a distinction in the act between definite duration and indefinite duration. We made a demand based on the indefinite duration provision, which was 180 days, all right? We were allowing them the opportunity to convert an illegal termination into a lawful non-renewal by agreeing to pay us some sum of money reflective of the commissions we would have made in 180 days pursuant to subdivision three of the act. The other issue- But the contract had recently been altered. Isn't that correct to take away contractual obligations to give notice, correct? Wasn't that the change that was made? Not to my recollection, and Judge Stranch, I may be misremembering here, but the change was made to take a state away or two states away from MEC and replace it with Northern Illinois, okay? It was a territory realignment, but there was also a change in how commissions were going to be paid in the interim period. I think Judge Stranch is referring to the difference between, I think, a 2016 version of the contract that required a 60-day notice and the 2020 version of the contract that didn't require any notice. Thank you. Thank you, Judge Blumkranz. You're correct. You're correct. The next point I'd like to hit very quickly, if I could, is the distinction between 187 and 188 of the restatement. They work hand-in-glove. One deals with a situation where there is a contractual choice of law, and 188 says if there is no contractual choice of law, but they work together. Right, but it's the restatement. If Kentucky law hasn't adopted both parts of the restatement, then they don't have independent force. In the Geico case, the Sixth Circuit did recognize two things. In the Sperl decision, the Kentucky Supreme Court didn't say whether they were adopting or not adopting 187. They've taken no position on it at all, other than to say, generally, we follow the restatement. But didn't we in Osborne at least interpret that case as such? I mean, you could say maybe we got it wrong, but isn't that a pretty clear holding in Osborne? But at the same time, in the Geico case, it's very clear that another panel of the Sixth Circuit did, did apply 187 and forecast it, if you will, that it would not be unreasonable to assume or believe that the Kentucky State Supreme Court, if asked if they would adopt 187, that they likely would. I see my time is up. Thank you.